UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN FOX, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 09-cv-7111 |
| v. ) | |
| ) | Judge John W. Darrah |
| NATIONWIDE CREDIT, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Susan Fox, filed an Amended Complaint against Defendant, Nationwide Credit, Inc. ("NCI"), asserting a violation of the Fair Debt Collection Practices Act ("FDCPA"), codified at 15 U.S.C. § 1692 *et seq.*, and the Illinois Collection Agency Act ("ICAA"), codified at 225 ILCS 425/1 *et seq.* Presently before the Court is NCI's Motion to Dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(3) and to Compel Arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3. For the reasons set forth below, NCI's Motion is denied.

### BACKGROUND

According to the allegations in her Amended Complaint, Plaintiff received several telephone messages from NCI, who was attempting to collect an unidentified debt Plaintiff had incurred for personal, family, or household purposes. She received the first message on or about October 16, 2009; it stated, "Message for Susan, Susan Fox: Please call me back at 866-505-9316." The telephone number recited in the message belongs to NCI. Plaintiff received another message approximately three days later: "Message for

Susan Fox: Hey Susan this is Gorav and I'm calling in regards to a very important business matter that I need to discuss with you, so please call me back today at 866-505-9316, extension 2059. Thank you." Plaintiff received three similar messages over the course of the next ten days. None of the messages identified the company calling, and none stated that the calls were being made in an attempt to collect a debt. Plaintiff claims that NCI's messages were violations of the FDCPA and the ICAA. She brings this action on behalf of herself and a class of similarly situated individuals in the 630 area code.

NCI argues that Plaintiff's claims must be arbitrated pursuant to a provision in a cardholder agreement between Plaintiff and the creditor to whom Plaintiff owed the alleged debt NCI was trying to collect. In support of its argument, NCI provides the following, additional information. In June 2003, Plaintiff opened a Lowe's consumer credit account with Monogram Credit Card Bank of Georgia ("Monogram"). (Ex. 2 to Mot. to Compel, Decl. of Martha Koehler, ¶ 7.[1]) Plaintiff's relationship with Monogram was defined by a cardholder agreement issued in connection with her Lowe's card. (Id. Ex. 2 ¶ 8.) In February 2005, Monogram merged with GE Capital Consumer Card to form GE Money Bank ("GE Money"). (Id. ¶ 7.) In January 2006, GE Money updated

---

[1] According to her declaration, Martha Koehler is an employee of a wholly owned subsidiary of GE Money Bank. Her declaration is used to support NCI's assertion that Plaintiff opened a Lowe's credit-card account that was ultimately transferred to GE Money Bank. Plaintiff argues that the declaration is insufficient to prove these facts for purposes of NCI's motion. Although consideration of a declaration in the context of resolving a motion to dismiss is proper, *see Reineke v. Circuit City Stores, Inc.*, No. 03 C 3146, 2004 WL 442639, at *1 (N.D. Ill. Mar. 8, 2004) (*Reineke*), it is unnecessary to consider Plaintiff's argument regarding the weight that should be given to Koehler's declaration. As discussed below, NCI has failed to show that the arbitration provision in Plaintiff's cardholder agreement applies to Plaintiff's claims against NCI.

the terms of Plaintiff's agreement with Monogram to include a new arbitration provision. (*Id.* ¶ 9.) GE Money provided Plaintiff with notice of these changes by including the arbitration provision with her 2006 billing statement. (*Id.* ¶ 9.) Rejection of the arbitration provision would have required written notice from Plaintiff, which she never provided.[2] (*Id.* ¶¶ 10-11.)

NCI's business records indicate that on or about October 9, 2009, a Lowe's credit-card account belonging to Plaintiff was referred to NCI for collection by GE Money. (Ex. 1 to Mot. to Dismiss, Decl. of Janet DeYoung, ¶ 3.) There appears to be no reasonable dispute that Plaintiff's Lowe's credit-card debt was the reason for the messages left by NCI.

## LEGAL STANDARD

NCI brings this Motion under the FAA and under Federal Rule of Civil Procedure 12(b)(3). In assessing a defendant's motion to dismiss under Rule 12(b)(3) for improper venue, the court must view the allegations in the complaint in the light most favorable to plaintiff and accept all well-pleaded facts in the complaint as true. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007); *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987). The court may also examine facts outside the complaint. *See Rotec Indus., Inc. v. Aecon Group, Inc.*, 436 F. Supp. 2d 931, 933 (N.D. Ill. 2006). Because a motion to compel arbitration is treated as an assertion that the court lacks subject-matter jurisdiction, the court may also consider background

---

[2] The credit agreement is attached as Exhibit A to NCI's Memorandum in Support of Its Motion to Dismiss. Plaintiff also attached the page containing only the arbitration provision as Exhibit A to her Response in Opposition to NCI's Motion to Dismiss.

information in the form of exhibits and affidavits in that context as well. *Reineke*, 2004 WL 442639, at *1 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The Defendant bears the burden of demonstrating that an agreement requires arbitration. *Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833, 868 (N.D. Ill. 2008); *see also Champ v. Siegel Trading Co.*, No. 89 C 7148, 1990 WL 19984, at *4 (N.D. Ill. Feb. 27, 1990) ("Since defendants are moving to compel arbitration and stay the present litigation, the burden is on defendants to show they are entitled to such relief.").

## ANALYSIS

The touchstone of an order compelling arbitration is a valid arbitration agreement. *Whisler v. H.J. Meyers & Co., Inc.*, 948 F. Supp. 798, 800 (N.D. Ill. 1996). The FAA provides that an arbitration clause in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has recognized that the FAA embodies a broad federal policy favoring arbitration. *See Shearson Am. Express, Inc. v. McMahon*, 482 U.S. 220, 225-26 (1987). However, "its provisions are not to be construed so broadly as to include claims that were never intended for arbitration." *Duthie v. Matria Healthcare*, 540 F.3d 533, 536 (7th Cir. 2008) (quoting *Am. Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929 (7th Cir. 2003). That is, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

The FAA generally requires a court to order arbitration where the court finds: (1) "a written agreement to arbitrate," (2) "a dispute within the scope of the arbitration agreement," and (3) "a refusal by the opposing party to proceed to arbitration." *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 687 (7th Cir. 2005). Whether the parties agreed to arbitrate is a matter of state contract law. *Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 806 (7th Cir. 2003). In this case, the cardholder agreement NCI seeks to assert contains an explicit choice-of-law provision that states that the substantive laws of the state of Utah apply.

NCI moves to compel Plaintiff to submit her claims to arbitration on the basis of the arbitration provision in the cardholder agreement between Plaintiff and GE Money. That provision states as follows:

> [U]pon the election of either party, any legal dispute between the parties will be resolved by binding arbitration. This provision replaces any existing arbitration provision between you and Us.
>
> Definitions: As used in this provision, "We," "Us," "Our," and similar terms mean (1) GE Money Bank and all of its respective parents, wholly or majority owned subsidiaries, predecessors, successors, assigns, employees, officers and directors (collectively, the "Bank"), and (2) Lowe's Companies, Inc. and all of its respective parents, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors (collectively, "Lowe's"), if Lowe's is named as a co-party with the Bank in a Claim asserted by you.
>
> "Claim" means any dispute between you and Us that arises from or relates to your credit card account, the relationships that result from the account, the Agreement or any prior agreement or credit card account, including the enforceability or scope of this Provision. . . .
>
> If you or We select to arbitrate a Claim, neither you nor We will have the right: (1) to have a court or a jury decide the Claim . . . .

(Ex. A to Pl. Resp.)

NCI contends that the arbitration provision is valid as to NCI and that Plaintiff's claims against NCI fall within its scope. Plaintiff contends that pursuant to the express language of the arbitration agreement, NCI is not a party thereto and, thus, cannot exercise rights conferred by the arbitration clause.[3]

The arbitration provision in Plaintiff's cardholder agreement plainly specifies the express parties to that agreement: "'We,' 'Us,' 'Our,' and similar terms mean GE Money Bank and all of its respective parents, wholly or majority owned subsidiaries, predecessors, successors, assigns, employees, officers and directors." NCI does not argue that it falls under any of the aforementioned categories of persons or entities included in the definition. Instead, NCI contends it is made part of the agreement by way of the "Claims" definition, which broadly defines the disputes that are subject to arbitration. NCI argues that because Plaintiff's claims arose directly from NCI's conduct as a debt collector for a GE Money account (arguably a dispute that "arises from or relates to . . . the relationships that result from [Plaintiff's] account"), NCI should be allowed to enforce the agreement.

This argument, however, focuses on the definition of "Claims" without regard for the definition of "Us," which plainly does not include third-party debt collectors, such as NCI. The definition of "Claims" incorporates the definition of "Us," and the arbitration provision applies to the resolution of legal claims between the cardholder and those

---

[3] Plaintiff also argues that even if the arbitration provision does apply to Plaintiff's claims, both of the arbitrators specifically selected in the arbitration provision are prohibited from hearing this dispute. Because NCI has not shown that this dispute is covered by the arbitration provision in Plaintiff's cardholder agreement, Plaintiff's alternative argument need not be addressed.

entities within the definition of "Us" without regard for the definition of "Claims." Thus, the definition of "Claims" only determines the types of disputes that can be resolved through arbitration and does not expand the scope of the parties subject to the arbitration clause; the definition of "Us" determines the parties entitled to enforce the provision. NCI is not an entity included in that definition.

The cases relied upon by NCI do not support any other interpretation of the arbitration agreement before the Court. NCI relies primarily on *Sherer v. Green Tree Servicing LLC.*, 548 F.3d 379 (5th Cir. 2008) (*Sherer*); and *Blinco v. Green Tree Servicing LLC.*, 400 F.3d 1308 (11th Cir. 2005) (*Blinco*). Both cases are distinguishable from the case at bar.

In *Sherer*, the Fifth Circuit held that a loan servicer, Green Tree, was able to compel arbitration, even though Green Tree was not specifically identified in the terms of the arbitration agreement between the plaintiff and the plaintiff's lender. *Id.* at 382. After Green Tree obtained the servicing rights to the loan in question, the plaintiff claimed that Green Tree charged him a pre-payment penalty that was contrary to his original loan agreement, attempted to collect the pre-payment penalty, and charged interest on the misapplied penalty. *Id.* at 380. Relying on language in the arbitration provision covering all claims "arising from or relating to this agreement," the *Sherer* court found that the Plaintiff's FDCPA claims arose from Green Tree's conduct as a loan servicer and therefore fell within the terms of the Loan Agreement. *Id.* at 382.

In that case, however, there was no mention of a provision in which the claims subject to arbitration were expressly and specifically limited to those between the debtor

7

and a defined list of persons and entities affiliated with the creditor, as exists in the arbitration clause here. The court simply noted that the arbitration clause covering any dispute arising out of the agreement was broad enough to include the plaintiff's claims against Green Tree.[4] *Id.* at 382 & n.3.

In *Blinco*, the Eleventh Circuit also considered Green Tree's ability to compel arbitration under an arbitration clause containing the exact same language. *See Blinco*, 400 F.3d at 1310. There, the plaintiffs claimed that Green Tree had violated a provision of the Real Estate Settlement Procedures Act, which required Green Tree to provide notice to the plaintiffs that their loan had been transferred to another entity for servicing. *Id.* at 1310-11. The Eleventh Circuit held that the plaintiffs' claims arose from the promissory note at issue and that "the language of the arbitration clause [contained in the promissory note] is broad enough to permit both Green Tree entities to invoke it, regardless of their signatory status." *Id.* at 1311-12. Again, unlike in the case at bar, there was no mention of any language in that arbitration clause defining the parties who were entitled to enforce the provision.

NCI further argues that it is entitled to enforce the arbitration clause against Plaintiff in this particular case even though it was not a signatory to the agreement containing the arbitration provision. A litigant may enforce an arbitration agreement in

---

[4] Moreover, the plaintiff's FDCPA claims in *Sherer* were based on violations of his contractual rights under his loan agreement – he could not maintain his claim without relying on that agreement – such that it would have been inequitable to allow the plaintiff to sue under the terms of the agreement but ignore the arbitration provision in the same contract. In the case at bar, Plaintiff is not making her claim based on the rights set out in her cardholder agreement, or even raising an issue as to the validity of the credit-card debt sought to be collected by NCI. Her claims are based only on the conduct of NCI in the course of attempting to collect a debt.

situations where traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party-beneficiary theories, waiver, and estoppel. *Arthur Anderson LLP v. Carlisle*, 129 S. Ct. 1896, 1902 (2009). Here, NCI asserts two such grounds: (1) that NCI is an intended third-party beneficiary of the arbitration provision in Plaintiff's cardholder agreement and (2) that Plaintiff is equitably estopped from opposing NCI's enforcement of the arbitration provision. As discussed below, NCI has not demonstrated that either of its asserted grounds provides a basis for NCI to enforce the arbitration provision in this case.

Utah common law defines third-party beneficiaries to a contract as those "recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration." *Rio Algom Corp. v. Jimco, Ltd.*, 618 P.2d 497, 506 (Utah 1980) (*Rio Algom*) (internal quotation marks omitted). A third party may claim a contract benefit only if the parties to the contract clearly express an intention "to confer a separate and distinct benefit" on the third party. *Id.*; *see also Price v. Pierce*, 823 F.2d 1114, 1121 (7th Cir. 1987) (stating that a non-signatory is permitted to enforce the agreement as a third-party beneficiary where the contract demonstrates the contracting parties intended to grant the non-signatory enforceable rights in the agreement).

In *Bybee v. Adullah*, 189 P.3d 40 (Utah 2008) (*Bybee*), the Utah Supreme Court considered the implications of an arbitration agreement on a wrongful-death claim asserted against a physician who sought to compel arbitration. *Id.* at 49. The physician

argued that an arbitration agreement signed by the plaintiff's deceased husband required the resolution of the plaintiff's claims through arbitration. *Id* at 42. The *Bybee* court rejected this argument, reasoning that "[a] third party may claim a contract benefit only if the parties to the contract clearly express an intention to confer a separate and distinct benefit on the third party." *Id.* at 50 (citing *Rio Algom*, 618 P.2d at 506). The court held that the wife, as a non-signatory, would not be bound by the aforementioned agreement due to a lack of "separate and distinct benefit" bestowed on her by signatory parties. *Id.*

In the case at bar, NCI is asserting the benefit of the arbitration agreement without showing where Plaintiff, as one of the contracting parties, intended to confer any "separate and distinct benefit" on NCI or other third-party debt collectors. *Cf. Bybee*, 189 P.3d at 50. Rather, the rights created by the arbitration provision relied upon by NCI – broad as they may be with regard to the *types* of claims that must be submitted to arbitration – were clearly intended to be limited to a specific list of persons and entities that had a right to enforce it.

NCI also contends that NCI is entitled to enforce the arbitration agreement under the doctrine of equitable estoppel. Specifically, NCI argues that Plaintiff put the cardholder agreement at issue by acknowledging the existence of a debt under that agreement and that it would thus be inequitable to allow her to deny the application of the arbitration provision appearing in that same agreement.

Both federal law and the common law of Utah recognize the doctrine of equitable estoppel as a means by which a non-signatory party may compel arbitration pursuant to an agreement. Equitable estoppel applies when the signatory "must rely on the terms of

the written agreement in asserting its claim" against a non-signatory party. *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999); *Hoffman v. Deloitte & Touche, LLP.*, 143 F. Supp. 2d 995, 1004-05 (N.D. Ill. 2001) (*Hoffman*); *Ellsworth v. Arbitration Ass'n*, 148 P.3d 983, 989 n.11 (Utah 2006) (stating that non-signatory estoppel can be asserted by non-signatory "when the signatory plaintiff sues a non-signatory defendant on the contract but seeks to avoid the contract-mandated arbitration by relying on the fact that the defendant is a non-signatory").

Here, Plaintiff's claim is not based on the terms of her cardholder contract. Plaintiff alleges only that NCI violated the FDCPA by leaving messages without identifying itself and without indicating that the calls were being made in an effort to collect a debt. Indeed, Plaintiff's claims are not even of a type that could be asserted in defense against a creditor suing on a breach of the cardholder agreement. The FDCPA provisions that prohibit certain conduct by "debt collectors" expressly exclude creditors calling on their own behalf, as well as their officers and employees. *See* 15 U.S.C. § 1692a(6); *Ruth v. Triumph P'ships*, 577 F.3d 790, 796 (7th Cir. 2009) ("The FDCPA distinguishes between debt collectors, who are subject to the statute's requirements, and creditors, who are not.").

NCI argues that the Plaintiff's acknowledgment of the debt constitutes a reliance on that agreement, which justifies the application of equitable estoppel. However, the mere existence of a debt does not justify extending an arbitration agreement to include alleged conduct prohibited by a debt-collection statute by an excluded non-signatory entity.

11

NCI also relies on *Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863 (E.D. Wis. 2006) (*Tickanen*), in support of its equitable-estoppel argument. That case, however, is inapposite for two reasons. First, the court held that the debt-collection agency being sued in that case was able to compel arbitration based on its status as an assignee – the plaintiff's account was assigned to another bank and subsequently closed and assigned to the defendant – because the plaintiff had agreed to arbitrate *any* claims against signatories *and assignees*. *Id.* at 866, 870. In the case at bar, there was no assignment of the debt. NCI merely argues that it was "referred" the debt, without defining the relationship that was created between GE Money and NCI on the basis of the referral. Indeed, NCI does not dispute Plaintiff's assertion that NCI was acting as a third-party debt collector.

Second, the plaintiff's FDCPA claim in *Tickanen* was based on the defendant's alleged misrepresentation as to the plaintiff's creditor. *Id.* at 865. Thus, in order to prove her claim, the plaintiff had to rely on her cardholder agreement to identify the proper creditor. For that reason, the *Tickanen* court held that she "presume[d] the existence of" her cardholder agreement such that she could not equitably ignore the portion of that agreement requiring her to arbitrate her claim. *Id.* at 870. Here, Plaintiff makes no such claim. Therefore, *Tickanen* is distinguishable from the case at hand.

Similarly, in *Hoffman* (also relied upon by NCI), the court held that non-signatories could enforce an arbitration agreement because their claims depended on the agreement that contained the arbitration provision: "Plaintiffs allege a scheme by defendants to acquire and improperly exploit their assets, using the contracts as a

12

principal instrument in the scheme. Thus, plaintiffs' fraud claims arise out of and relate to the contracts," such that the plaintiffs were equitably estopped from avoiding arbitration. *Hoffman*, 143 F. Supp. 2d at 1003-05. Again, Plaintiff makes no such claims.

Moreover, the court in *Hoffman* found that the contract at issue included terms written expressly for the defendants' benefit and that the conduct of the defendants and signatories was so intertwined as to the alleged fraud that "only by allowing the non-signatories to invoke arbitration would evisceration of the agreements be avoided." *Id.* at 1005. None of those elements are present in Plaintiff's Complaint.

On this issue, the reasoning in *Masters v. Lowe's Home Centers, Inc.*, 09-cv-255-JPG, 2009 WL 1657925 (S.D. Ill. June 11, 2009), is persuasive. There, the district court reviewed an arbitration clause that is exactly the same as the clause at issue in this suit and held that the plaintiff was not estopped from denying its application to her claim that the defendant (a non-signatory) violated federal law by failing to truncate her credit-card number on a receipt:

> The Court agrees that Masters's claim does not rely on any terms or provision of the credit card agreement with GE Money Bank. Although Masters was arguably exercising one of her rights under the Agreement in making her credit card payment at a Lowes store, her claim against Lowes does not refer to nor depend on her contractual rights. In a very real sense, any consumer who pays a merchant by credit card is exercising one of her rights under that credit agreement. Surely, the doctrine of equitable estoppel does not mean the merchant can shelter under the arbitration provisions of those agreements. There is no inequity unless the plaintiff refuses to abide by the arbitration provisions of a contract while simultaneously insisting that the non-signatory defendant abide by the terms of the contract. That is not the case here.

*Id.* at *3. Nor is it the case here.

13

NCI has failed to demonstrate that the arbitration clause in Plaintiff's cardholder agreement with GE Money should be enforced. Therefore, NCI's Motion is denied.

## CONCLUSION

For the reasons stated above, NCI's Motion to Dismiss and to Compel Arbitration is denied.

Date: August 25, 2010

JOHN W. DARRAH
United States District Court Judge

14